# TREATY KNOWLEDGE BETWEEN LIBERIA AND THE UNITED STATES

# Notary Acceptor

Notary: _L. Barry M. Hamilton_ My Commission Exp. _12/27/2009_

Case 5:08-cv-00455-CAR-GMF   Document 1-6   Filed 12/29/08   Page 2 of 13

No. 5596.   EXCHANGE OF NOTES CONSTITUTING AN AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND LIBERIA RELATING TO THE GUARANTY OF PRIVATE INVESTMENTS. MONROVIA, 6 AND 12 SEPTEMBER 1960[1]

EXCHANGE OF NOTES CONSTITUTING AN AGREEMENT[2] SUPPLEMENTING THE ABOVE-MENTIONED AGREEMENT. MONROVIA, 26 AND 29 SEPTEMBER 1964

*Official text: English.*
*Registered by the United States of America on 27 April 1965.*

I

*The American Ambassador to the Liberian Secretary of State*

Monrovia, September 26, 1964

Sir :

I have the honor to refer to the agreement effected by the exchange of notes of September 6 and September 12, 1960[1] between our two Governments relating to investment guaranties which may be issued by the Government of the United States of America for investments in activities in Liberia.  After the conclusion of this agreement, legislation has been enacted in the United States of America modifying and augmenting the coverage to be provided investors by investment guaranties that may be issued by the Government of the United States of America.

In the interest of facilitating and increasing the participation of private enterprise in furthering the economic development of Liberia, the Government of the United States of America is prepared to issue investment guaranties providing such coverage as may be authorized by the applicable United States legislation for appropriate investments in activities approved by your Government provided that your Government agrees that the undertakings between our respective Governments contained in the above-mentioned agreement will be applicable to such guaranties.

In connection with application of the undertakings contained in the above-mentioned agreement to all investment guaranties issued by the Government of the United States of America, I also have the honor to propose that the Subparagraphs (*d*) and (*e*) of Paragraph 3 of the above-mentioned agreement be considered as no longer in effect.

I confirm the mutual understanding of the parties to the present Agreement that, in case the Government of the United States of America makes payment to a United States investor under a guaranty against loss due to normal business risk arising from transactions with entities other than the Government of the Republic of Liberia, the Government of the United States of America would have no claim against the Govern-

---

[1] United Nations, *Treaty Series*, Vol. 389, p. 245.
[2] Came into force on 29 September 1964 by the exchange of the said notes.

ment of the Republic of Liberia resulting from such payment by the Government of the United States of America.

Upon receipt of a note from Your Excellency indicating that the foregoing is acceptable to the Government of the Republic of Liberia and that such undertakings shall apply, the Government of the United States of America will consider that this note and your reply thereto constitute an Agreement between our two Governments on this subject, the Agreement to enter into force on the date of your note in reply.

Accept, Excellency, the assurances of my highest consideration.

C. E. RHETTS

His Excellency J. Rudolph Grimes
Secretary of State

## II

*The Liberian Acting Secretary of State to the American Ambassador*

DEPARTMENT OF STATE
MONROVIA, LIBERIA

14472/DF

29th September, 1964

Mr. Ambassador :

I have the honour to acknowledge receipt of your letter dated September 26, 1964, relating to the Investment Guaranty Agreement which was concluded between the Government of the United States of America and the Government of the Republic of Liberia on September 12, 1960, which letter reads word for word as follows :

[*See note I*]

The Government of Liberia accepts the undertakings in this letter and understands that upon receipt thereof, your letter and this letter shall constitute an agreement between the Government of the Republic of Liberia and the Government of the United States of America to enter into force on the date of this letter.

Please accept, Mr. Ambassador, the assurance of my high consideration and esteem.

Edward R. MOORE
Acting Secretary of State

His Excellency Charles E. Rhetts
Ambassador Extraordinary and Plenipotentiary
Embassy of the United States of America
Mamba Point, Monrovia, Liberia

# N° 4711.

—

## ÉTATS-UNIS D'AMÉRIQUE ET LIBÉRIA

### Traité d'amitié, de commerce et de navigation. Signé à Monrovia, le 8 août 1938.

*Texte officiel anglais communiqué par l'envoyé extraordinaire et ministre plénipotentiaire des États-Unis d'Amérique à Berne. L'enregistrement a eu lieu le 12 avril 1940.*

———

## UNITED STATES OF AMERICA AND LIBERIA

### Treaty of Friendship, Commerce and Navigation. Signed at Monrovia, August 8th, 1938.

*English official text communicated by the Envoy Extraordinary and Minister Plenipotentiary of the United States of America at Berne. The registration took place April 12th, 1940.*

Case 5:08-cv-00455-CAR-GMF    Document 1-6    Filed 12/29/08    Page 5 of 13

## No. 4711. — TREATY [1] OF FRIENDSHIP, COMMERCE AND NAVIGATION BETWEEN THE UNITED STATES OF AMERICA AND THE REPUBLIC OF LIBERIA. SIGNED AT MONROVIA, AUGUST 8TH, 1938.

THE UNITED STATES OF AMERICA and THE REPUBLIC OF LIBERIA, desirous of strengthening the bond of peace which happily prevails between them, by arrangements designed to promote friendly intercourse between their respective territories through provisions responsive to the spiritual, cultural, economic and commercial aspirations of the people thereof, have resolved to conclude a Treaty of Friendship, Commerce and Navigation and for that purpose have appointed as their Plenipotentiaries,

THE PRESIDENT OF THE UNITED STATES OF AMERICA :

Lester A. WALTON, Envoy Extraordinary and Minister Plenipotentiary of the United States of America to the Republic of Liberia, and

THE PRESIDENT OF THE REPUBLIC OF LIBERIA :

His Excellency C. L. SIMPSON, Secretary of State of the Republic of Liberia,

Who, having communicated to each other their full powers found to be in due form, have agreed upon the following Articles :

### Article I.

The nationals of each of the High Contracting Parties shall be permitted to enter, travel and reside in the territories of the other ; to exercise liberty of conscience and freedom of worship ; to engage in professional, scientific, religious, philanthropic, manufacturing and commercial work of every kind without interference ; to carry on every form of commercial activity which is not forbidden by the local law ; to own, erect or lease and occupy appropriate buildings and to lease lands for residential, scientific, religious, philanthropic, manufacturing, commercial and mortuary purposes ; to employ agents of their choice, and generally to do anything incidental to or necessary for the enjoyment of any of the foregoing privileges upon the same terms as nationals of the State of residence or as nationals of the nation hereafter to be most favored by it, submitting themselves to all local laws and regulations duly established.

The nationals of either High Contracting Party within the territories of the other shall not be subjected to the payment of any internal charges or taxes other or higher than those that are exacted of and paid by nationals of the State of residence.

The nationals of each High Contracting Party shall enjoy freedom of access to the courts of justice of the other on conforming to the local laws, as well for the prosecution as for the defense of their rights, and in all degrees of jurisdiction established by law.

The nationals of each High Contracting Party shall receive within the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their persons and property, and shall enjoy in this respect that degree of protection that is required by international law. Their property shall not be taken without due process of law and without payment of just compensation.

---

[1] The exchange of ratifications took place at Monrovia, November 21st, 1939.

Nothing contained in this Treaty shall be construed to affect existing statutes of either of the High Contracting Parties in relation to emigration or to immigration or the right of either of the High Contracting Parties to enact such statutes, provided, however, that nothing in this paragraph shall prevent the nationals of either High Contracting Party from entering, traveling and residing in the territories of the other Party in order to carry on international trade or to engage in any commercial activity related to or connected with the conduct of international trade on the same terms as nationals of the most-favored nation.

## Article II.

With respect to that form of protection granted by National, State or Provincial laws establishing civil liability for bodily injuries or for death, and giving to relatives or heirs or dependents of an injured person a right of action or a pecuniary compensation, such relatives or heirs or dependents of the injured person, himself a national of either of the High Contracting Parties and injured within any of the territories of the other, shall, regardless of their alienage or residence outside of the territory where the injury occurred, enjoy the same rights and privileges as are or may be granted to nationals, and under like conditions.

## Article III.

The dwellings, warehouses, manufactories, shops, and other places of business, and all premises thereto appertaining of the nationals of each of the High Contracting Parties in the territories of the other, lawfully used for any purposes set forth in Article I, shall be respected. It shall not be allowable to make a domiciliary visit to, or search of any such buildings and premises, or there to examine and inspect books, papers or accounts, except under the conditions and in conformity with the forms prescribed by the laws, ordinances and regulations for nationals of the State of residence or nationals of the nation most favored by it.

## Article IV.

Where, on the death of any person holding real or other immovable property or interets therein within the territories of one High Contracting Party, such property or interests therein would, by the laws of the country or by a testamentary disposition, descend or pass to a national of the other High Contracting Party, whether resident or non-resident, were he not disqualified by the laws of the country where such property or interests therein is or are situated, such national shall be allowed a term of three years in which to sell the same, this term to be reasonably prolonged if circumstances render it necessary, and withdraw the proceeds thereof, without restraint or interference and exempt from any estate succession, probate or administrative duties or charges other than those which may be imposed in like cases upon the nationals of the country from which such proceeds may be drawn.

Nationals of either High Contracting Party may have full power to dispose of their personal property of every kind within the territories of the other, by testament, donation, or otherwise, and their heirs, legatees and donees, of whatsoever nationality, whether resident or non-resident, shall succeed to such personal property, and may take possession thereof, either by themselves or by others acting for them, and retain or dispose of the same at their pleasure subject to the payment of such duties or charges only as the nationals of the High Contracting Party within whose territories such property may be or belong shall be liable to pay in like cases. In the same way, personal property left to nationals of one of the High Contracting Parties by nationals of the other High Contracting Party, and being within the territories of such other Party, shall be subject to the

No 4711

payment of such duties or charges only as the nationals of the High Contracting Party within whose territories such property may be or belong shall be liable to pay in like cases.

### Article V.

The nationals of each of the High Contracting Parties in the exercise of the right of freedom of worship, within the territories of the other, as hereinabove provided, may, without annoyance or molestation of any kind by reason of their religious belief or otherwise, conduct services either within their own houses or within any appropriate buildings which they may be at liberty to erect and maintain in convenient situations, provided their teachings or practices are not contrary to public morals ; and they shall also be permitted to bury their dead according to their religious customs in suitable and convenient places established and maintained for the purpose, subject to the mortuary and sanitary laws and regulations of the place of burial.

### Article VI.

In the event of war between either High Contracting Party and a third State, such Party may draft for compulsory military service nationals of the other having a permanent residence within its territories and who have formally, according to its laws, declared an intention to adopt its nationality by naturalization, unless such persons depart from the territories of said belligerent Party within sixty days after the declaration of war. Such right to depart shall apply also to persons possessing the nationality of both High Contracting Parties unless they habitually reside in the territory of the country drafting for compulsory military service.

It is agreed, however, that such right to depart shall not apply to natives of the country drafting for compulsory military service who, after having become nationals of the other Party, have declared an intention to acquire or resume the nationality of the country of their birth. Such persons shall nevertheless be entitled in respect of this matter to treatment no less favorable than that accorded the nationals of any other country who are similarly situated.

### Article VII.

Between the territories of the High Contracting Parties there shall be freedom of commerce and navigation. The nationals of each of the High Contracting Parties equally with those of the most-favored nation, shall have liberty freely to come with their vessels and cargoes to all places, ports and waters of every kind within the territorial limits of the other which are or may be open to foreign commerce and navigation.

### Article VIII.

With respect to customs duties or charges of any kind imposed on or in connection with importation or exportation, and with respect to the method of levying such duties or charges, and with respect to all rules and formalities in connection with importation or exportation, and with respect to all laws or regulations affecting the sale, taxation, or use of imported goods within the country, any advantage, favor, privilege or immunity which has been or may hereafter be granted by either High Contracting Party to any article originating in or destined for any third country, shall be accorded immediately and unconditionally to the like article originating in or destined for the other High Contracting Party.

With respect to the amount and collection of duties on imports and exports of every kind, each of the two High Contracting Parties binds itself to give to the nationals, vessels and goods of the other the advantage of every favor, privilege or immunity which it shall have accorded to

the nationals, vessels and goods of a third State, whether such favored State shall have been accorded such treatment gratuitously or in return for reciprocal compensatory treatment. Every such favor, privilege or immunity which shall hereafter be granted to nationals, vessels or goods of a third State shall simultaneously and unconditionally, without request and without compensation, be extended to the other High Contracting Party, for the benefit of itself, its nationals, vessels, and goods.

### Article IX.

Neither of the High Contracting Parties shall establish or maintain any import or export prohibition or restriction on any article originating in or destined for the territory of the other High Contracting Party, which is not applied to the like article originating in or destined for any third country. Any abolition of an import or export prohibition or restriction which may be granted even temporarily by either High Contracting Party in favor of an article originating in or destined for a third country shall be applied immediately and unconditionally to the like article originating in or destined for the territory of the other High Contracting Party.

If either High Contracting Party establishes or maintains any form of quantitative restriction or control of the importation or sale of any article in which the other High Contracting Party has an interest, or imposes a lower import duty or charge on the importation or sale of a specified quantity of any such article than the duty or charge imposed on importations in excess of such quantity, the High Contracting Party taking such action shall, upon request, inform the other High Contracting Party as to the total quantity, or any change therein, of any such article permitted to be imported or sold, or permitted to be imported or sold at such lower duty or charge during a specified period, and shall allot to the other High Contracting Party for such specified period a proportion of such total quantity as originally established or subsequently changed in any manner equivalent to the proportion of the total importation of such article which the other High Contracting Party supplied during a previous representative period, unless it is mutually agreed to dispense with such allotment. Neither of the High Contracting Parties shall, by import licenses, regulate the total quantity of importations into its territory or sales therein of any article in which the other High Contracting Party has an interest, unless the total quantity of such article permitted to be imported or sold during a quota period of not less than three months shall have been established, and unless the regulations covering the issuance of such licenses or permits shall have been made public before such regulations are put into force.

### Article X.

If either High Contracting Party establishes or maintains, directly or indirectly, any form of control of the means of international payment, it shall, in the administration of such control :

(a) Impose no prohibition, restriction, or delay on the transfer of payment for imported articles the growth, produce, or manufacture of the other High Contracting Party, or of payments necessary for and incidental to the importation of such articles ;

(b) Accord unconditionally, with respect to rates of exchange and taxes or surcharges on exchange transactions in connection with payments for or payments necessary and incidental to the importation of articles the growth, produce, or manufacture of the other High Contracting Party, treatment no less favorable than that accorded in connection with the importation of any article whatsoever the growth, produce, or manufacture of any third country ; and

(c) Accord unconditionally, with respect to all rules and formalities applying to exchange transactions in connection with payments for or payments necessary and incidental to the importation of articles the growth, produce, or manufacture of the

other High Contracting Party, treatment no less favorable than that accorded in connection with the importation of the like articles the growth, produce, or manufacture of any third country.

With respect to non-commercial transactions, each High Contracting Party shall apply any form of control of the means of international payment in a non-discriminatory manner as between the nationals of the other High Contracting Party and the nationals of any third country.

### Article XI.

In the event that either High Contracting Party establishes or maintains a monopoly for the importation, production or sale of a particular product or grants exclusive privileges, formally or in effect, to one or more agencies to import, produce or sell a particular product, the High Contracting Party establishing or maintaining such monopoly, or granting such monopoly privileges, shall, in respect of the foreign purchases of such monopoly or agency, accord the commerce of the other High Contracting Party fair and equitable treatment. In making its foreign purchases of any article such monopoly or agency shall be influenced solely by competitive considerations such as price, quality, marketability, and terms of sale.

### Article XII.

All articles which are or may be legally imported from foreign countries into ports of the United States of America or are or may be legally exported therefrom in vessels of the United States may likewise be imported into those ports or exported therefrom in Liberian vessels, without being liable to any other or higher duties or charges whatsoever than if such articles were imported or exported in vessels of the United States; and reciprocally, all articles which are or may be legally imported from foreign countries into the ports of Liberia or are or may be legally exported therefrom in Liberian vessels may likewise be imported into those ports or exported therefrom in vessels of the United States without being liable to any other or higher duties or charges whatsoever than if such articles were imported or exported in Liberian vessels.

In the same manner there shall be perfect reciprocal equality in relation to the flags of the two countries with regard to bounties, drawbacks, and other privileges of this nature of whatever denomination which may be allowed in the territories of each of the Contracting Parties, on goods imported or exported in national vessels so that such bounties, drawbacks and other privileges shall also and in like manner be allowed on goods imported or exported in vessels of the other country.

### Article XIII.

The nationals, goods, products, wares, and merchandise of each High Contracting Party within the territories of the other shall receive the same treatment as nationals, goods, products, wares, and merchandise of the country with regard to internal taxes, transit duties, charges in respect of warehousing and other facilities and the amount of drawbacks and export bounties.

### Article XIV.

The merchant or other private vessels and cargoes of one of the High Contracting Parties shall, within the territorial waters and harbors of the other Party in all respects and unconditionally be accorded the same treatment as the vessel and cargoes of that Party, irrespective of the port of departure of the vessel, or the port of destination, and irrespective of the origin or the destination of the cargo. It is especially agreed that no duties of tonnage, harbor, pilotage, lighthouse, quarantine, or other similar or corresponding duties or charges of whatever denomination, levied in the name or for the profit of the Government, public functionaries, private individuals, corporations

or establishments of any kind shall be imposed in the ports of the territories or territorial waters of either country upon the vessels of the other, which shall not equally, under the same conditions, be imposed on national vessels.

### Article XV.

Merchant vessels and other privately owned vessels under the flag of either of the High Contracting Parties, and carrying the papers required by its national laws in proof of nationality shall, both within the territorial waters of the other High Contracting Party and on the high seas, be deemed to be the vessels of the Party whose flag is flown.

### Article XVI.

Merchant vessels and other privately owned vessels under the flag of either of the High Contracting Parties shall be permitted to discharge portions of cargoes at any port open to foreign commerce in the territories of the other High Contracting Party, and to proceed with the remaining portions of such cargoes to any other ports of the same territories open to foreign commerce, without paying other or higher tonnage dues or port charges in such cases than would be paid by national vessels in like circumstances, and they shall be permitted to load in like manner at different ports in the same voyage outward, provided, however, that the coasting trade of the High Contracting Parties is exempt from the provisions of this Article and from the other provisions of this Treaty, and is to be regulated according to the laws of each High Contracting Party in relation thereto. It is agreed, however, that nationals and vessels of either High Contracting Party shall within the territories of the other enjoy with respect to the coasting trade most-favored-nation treatment.

### Article XVII.

Limited liability and other corporations and associations, whether or not for pecuniary profit, which have been or may hereafter be organized in accordance with and under the laws, National, State or Provincial, of either High Contracting Party and which maintain a central office within the territories thereof, shall have their juridical status recognized by the other High Contracting Party provided that they pursue no aims within its territories contrary to its laws. They shall enjoy free access to the courts of law and equity, on conforming to the laws regulating the matter, as well for the prosecution as for the defense of rights in all the degrees of jurisdiction established by law.

The right of corporations and associations of either High Contracting Party which have been so recognized by the other to establish themselves in the territories of the other Party or to establish branch offices and fulfill their functions therein shall depend upon and be governed solely by the consent of such Party as expressed in its National, State or Provincial laws.

### Article XVIII.

The nationals of either High Contracting Party shall enjoy within the territories of the other, upon compliance with the conditions there imposed, such rights and privileges as have been or may hereafter be accorded the nationals of any other State with respect to organization of and participation in limited liability and other corporations and associations, for pecuniary profit or otherwise, including the rights of promotion, incorporation, purchase and ownership and sale of shares and the holding of executive or official positions therein. In the exercise of the foregoing rights and with respect to the regulation or procedure concerning the organization or conduct of such corporations or associations, such nationals shall be subjected to no condition less favorable than those which have been or may hereafter be imposed upon the nationals of the most-favored nation. The right of any of such corporations or associations as may be organized or controlled or participated in by the nationals of either High Contracting Party within the territories of the other to exercise any of their functions therein, shall be governed by the laws and regulations,

National, State or Provincial, which are in force or may hereafter be established within the territories of the Party wherein they propose to carry on their activities. The foregoing stipulations do not apply to organization of and participation in political associations.

## Article XIX.

The nationals, including corporations and associations, of either High Contracting Party shall enjoy in the territories of the other Party, upon compliance with the conditions there imposed, most-favored-nation treatment in respect of the exploration for and exploitation of mineral resources ; provided that neither Party shall be required to grant rights and privileges in respect of the mining of coal, phosphate, oil, oil shale, gas and sodium on the public domain, or in respect of the ownership of stock in domestic corporations engaged in such operations, greater than its nationals, corporations and associations receive from the other Party.

It is understood, however, that neither High Contracting Party shall be required by anything in this paragraph to grant any application for any such right or privilege if at the time such application is presented the granting of all similar applications shall have been suspended or discontinued.

## Article XX.

Commercial travelers representing manufacturers, merchants and traders domiciled in the territories of either High Contracting Party shall on their entry into and sojourn in the territories of the other Party and on their departure therefrom be accorded the most-favored-nation treatment in respect of customs and other privileges and of all charges and taxes of whatever denomination applicable to them or to their samples.

If either High Contracting Party requires the presentation of an authentic document establishing the identity and authority of a commercial traveler, a signed statement by the concern or concerns represented, certified by a consular officer of the country of destination shall be accepted as satisfactory.

## Article XXI.

There shall be complete freedom of transit through the territories including territorial waters of each High Contracting Party on the routes most convenient for international transit, by rail, navigable waterway, and canal, other than the Panama Canal and waterways and canals which constitute international boundaries, to persons and goods coming from, going to or passing through the territories of the other High Contracting Party, except such persons as may be forbidden admission into its territories or goods of which the importation may be prohibited by law or regulations, provided that the foregoing shall not be construed to prevent either High Contracting Party from excluding aliens from special areas within its territories closed to visit by law, military order or regulations. The measures of a general or particular character which either of the High Contracting Parties is obliged to take in case of an emergency affecting the safety of the State or vital interests of the country may, in exceptional cases and for as short a period as possible, involve a deviation from the provisions of this paragraph, it being understood that the principle of freedom of transit must be observed to the utmost possible extent.

Persons and goods in transit shall not be subjected to any transit duty, or to any unnecessary delays or restrictions, or to treatment as regards charges, facilities, or any other matter less favorable than that accorded to the most-favored nation.

Goods in transit must be entered at the proper customhouse, but they shall be exempt from all customs or other similar duties.

It is understood that all goods in transit through the territory of the United States of America and all goods in transit through the territory of Liberia when warehoused or otherwise stored shall be subject to storage charges.

All charges imposed on transport in transit shall be reasonable, having regard to the conditions of the traffic.

Nothing in this Article shall affect the right of either of the High Contracting Parties to prohibit or restrict the transit of arms, munitions and military equipment in accordance with treaties or conventions that may have been or may hereafter be entered into by either Party with other countries.

## Article XXII.

Nothing in this Treaty shall be construed to prevent the adoption of measures prohibiting or restricting the exportation or importation of gold or silver, or to prevent the adoption of such measures as either High Contracting Party may see fit with respect to the prohibition, or the control, of the export or sale for export, of arms, ammunition, or implements of war, and, in exceptional circumstances, all other military supplies.

Subject to the requirement that, under like circumstances and conditions, there shall be no arbitrary discrimination by either High Contracting Party against the other High Contracting Party in favor of any third country, the stipulations of this Treaty shall not extend to prohibitions or restrictions (1) imposed on moral or humanitarian grounds ; (2) designed to protect human, animal, or plant life or health ; (3) relating to prison-made goods ; (4) relating to the enforcement of police or revenue laws.

The stipulations of this Treaty do not extend to advantages now accorded or which may hereafter be accorded to neighboring States in order to facilitate short frontier traffic, or to advantages resulting from a customs union to which either High Contracting Party may become a party so long as such advantages are not extended to any other country.

The stipulations of this Treaty do not extend to advantages now accorded or which may hereafter be accorded by the United States of America, its territories or possessions or the Panama Canal Zone to one another or to the Republic of Cuba. The provisions of this paragraph shall continue to apply in respect of any advantages now or hereafter accorded by the United States of America, its territories or possessions or the Panama Canal Zone to one another, irrespective of any change in the political status of any of the territories or possessions of the United States of America.

## Article XXIII.

Subject to any limitation or exception hereinabove set forth, or hereafter to be agreed upon, the territories of the High Contracting Parties to which the provisions of this Treaty extend shall be understood to comprise all areas of land and water over which the Parties, respectively, claim and exercise dominion as sovereign thereof, except the Panama Canal Zone.

## Article XXIV.

The present Treaty shall come into force in all of its provisions on the day of the exchange of ratifications and shall continue in force for the term of five years from that day.

If within one year before the expiration of five years from the date on which the present Treaty shall come into force, neither High Contracting Party notifies to the other Party an intention

of terminating the Treaty upon the expiration of the aforesaid period of five years, the Treaty shall remain in full force and effect after the aforesaid period and until one year from such a time as either of the High Contracting Parties shall have notified to the other Party an intention of terminating it.

The present Treaty shall, from the date of the exchange of ratifications, be deemed to supplant the Treaty[1] of Commerce and Navigation between the United States of America and Liberia, concluded at London on October 21st, 1862.

*Article* XXV.

The present Treaty shall be ratified, and the ratifications thereof shall be exchanged at Monrovia as soon as possible.

In witness whereof the respective Plenipotentiaries have signed the present Treaty and have affixed their seals thereto.

Done in duplicate, at Monrovia, this eighth day of August nineteen hundred and thirty eight.

(*Seal*)   Lester A. WALTON.            (*Seal*)   C. L. SIMPSON.

Certified to be a true and complete textual copy of the original treaty in the sole language in which it was signed.

For the Secretary of State
of the United States of America :

Edward Yardley,
*Director of Personnel.*

---

[1] *British and Foreign State Papers*, Vol. 52, page 226.